CAVANAUGH, Judge.
These two suits were consolidated for the purpose of trial in the district court.. The suit of Roy Hebert against the defendant Howard E. Hatch is for damages for personal injuries, mental pain and suffering growing out of a. collision between a motorcycle being operated by him as a traffic patrolman of the city of Baton Rouge and a Jeep automobile being driven by the defendant Howard E. Hatch. The suit of the city of Baton Rouge, against the same defendant is for the value or damage to the motorcycle, being operated by the plaintiff Roy Hebert and destroyed in the collision.
The accident occurred on Nicholson Boulevard in the city of Baton Rouge, which runs south from the business district of the city of Baton Rouge to the Louisiana State University. This thoroughfare is 61 feet wide at the place where the accident occurred and consists of four traffic lanes, two on each side of the neutral ground, which is in the center. The east half of the boulevard, or the two lanes east of the neutral ground, is for traffic going north from the Louisiana State University to the city of Baton Rouge and the west half of the boulevard is for traffic going south from the city of Baton Rouge to -the Louisiana State University. The two lanes in the eastern half of the driveway where the accident occurred is approximately 24 feet and 4 inches wide, that is, from the.eastern curb *866 of the eastern lane of traffic to the inner-curb on the east side of the neutral ground. There are breaks in various parts of the neutral ground to permit traffic going -from the university to the city of Baton Rouge, or from the city of Baton Rouge to the university, to cross from! one side of the boulevard to the other.
The accident in which plaintiff and defendant were involved is alleged to have occurred 150 feet east of 1600 Nicholson-Drive. Plaintiff alleges that on October 26, 1951, at approximately 11:30 a.m., while he was driving his motorcycle in his capacity as motorcycle patrolman, he was involved in a collision with a Jeep automobile owned and operated by the defendant. He alleges that he was traveling in a northerly direction in the inside lane of travel to the rear of defendant’s vehicle and that defendant was traveling in the same direction in the right, or outside, lane of travel; that plaintiff signaled his intention to pass by blowing his horn and was in the process of passing when defendant made a sharp left turn from the outside lane of travel across his path in an attempt to drive through a break in the neutral ground, without giving any warning. He further alleges that the left turn being made by defendant was made in such close proximity to him that he was unable to avoid the .collision. That the acts of negligence charged against the defendant were the following: (1) not having his automobile under.proper control; (2) not keeping a proper lookout; (3) making a sharp left turn from the outside lane of travel across petitioner’s path in such close proximity that it was impossible for petitioner to avoid the collision; (4) in making a left turn from the wrong lane of travel; (5) and in operating his automobile in a reckless and careless manner without due regard to the safety of others in the vicinity at the time.
The defendant categorically denied any acts of negligence on his part but admitted that there was a collision between a Jeep automobile being operated by him and a motorcycle driven by plaintiff. He affirmatively' alleged that at the time of the accident, he was driving his- Jeep automobile in.the inside lane of travel adjacent to the neutral ground of Nicholson Drive and that prior" to turning in the break in the neutral ground, he gave a hand signal to- traffic behind indicating that he was making a left turn; and immediately at that time, of at the time he began to make the left turn, the motorcycle being operated by the plaintiff crashed into the left rear of the Jeep. The defendant affirmatively alleged that the plaintiff was negligent (1) in not keeping a proper lookout, keeping the motorcycle under proper control; (2) failing to slacken the speed of the motorcycle when he saw defendant slowing his speed preparing to make the left turn through the break; (3) driving the motorcycle carelessly under the circumstances, particularly in attempting to pass the Jeep automobile being driven by defendant on the inside lane for traffic proceeding northerly on Nicholson- Drive; (4) operating the motorcycle at a fast and rapid rate of speed under the circumstances; (5) failing to see, or if he did see, failing to heed the warning signal of defendant signaling his intention to make a left turn through the break; (6) if the brakes on the motorcycle were defective, with which defendant was without information, plaintiff-was negligent in operating said motorcycle when the brakes were defective; and, (7) finally charging the plaintiff of careless and reckless driving of the motorcycle, all of which defendant claims proximately caused the accident. Alternatively, defendant pled contributory negligence on the part of plaintiff and alleged the specific acts of negligence previously set out as acts of negligence .on the part of plaintiff proximately causing the accident. The defendant’s pleading then contained a reconventional demand against the plaintiff for the damage to his’ Jeep automobile, which he alleged was $196..
The Maryland Casualty Company intervened in the suit of Roy Hebert seeking to recover the sum of $1,196.02 against both plaintiff and defendant out of any judgment recovered" by Roy Hebert against the defendant for compensation which it had' paid to Hebert under a compensation pol *867 icy issued on 'the employees of the city o'f Baton Rouge, together with $300 attorney’s fees. The claim of Roy Hebert for compensation was subsequently compromised and after intervenor had paid Hebert 60 weeks compensation at $30 per week, or $1,800, and made a compromise settlement with him in a lump sum in addition to the amount paid of $4,779.85.
In the suit of city of Baton Rouge against the defendant for the value of the motorcycle the same acts of negligence were charged against the defendant by the city of Baton Rouge and the same pleas were made by defendant as made in the suit of Hebert.
After a, lengthy trial in the district court, the district judge rendered a judgment in favor of defendant in both cases, rejecting the demands of plaintiffs, and also the re-conventional demand of defendant. He assigned written reasons for judgment and held that on the conflicting testimony the plaintiffs and defendant had failed to prove their respective demands by a preponderance of the evidence.
The plaintiffs have appealed in both cases and the appeals were consolidated in this Court for argument.
The plaintiff Hebert testified that he entered Nicholson Boulevard at the Louisiana State University and proceeded to drive his motorcycle on the outside lane toward the city of Baton Rouge, traveling north in the east lane of traffic. That when he first saw the Jeep being operated by defendant, it was traveling on the east lane of the boulevard for north bound traffic. When he proceeded to pass the Jeep he blew his horn and started around and was in the inner lane, or the west side for north bound traffic, and at that time the Jeep made no move other than going straight ahead. He stated that the Jeep attempted a left turn just about the time that the front end of his motorcycle was about even with the rear end of the Jeep and when it did, he laid down on the horn of the motorcycle, meaning the horn on the handle bar, and laid the motorcycle over trying to stall for time to give him time to pass.-.'He'meant by laying the motorcycle over that it was tilted to the left. That the driver o.f the Jeep did not heed his horn and kept on going across his front and that his motorcycle caught right about the rear end of the left side of the Jeep. He stated that the driver of the Jeep did not give any hand signal and that the horn on his motorcycle was in good working order. He wa9 then asked where the vehicles came to rest after the accident and he stated that the front end of the motorcycle went up underneath the Jeep right about center ways of the left hand side of the Jeep and underneath the door. He stated that the damage done to the Jeep would be from the rear end on the left side on to centerways of the left hand side of the Jeep. He testified that the Jeep was approximately 35 or 40 feet ahead of him when he blew his horn, that he was traveling at a speed of 25 or 30 miles an hour and that the speed of the Jeep was a little less than what he was traveling, which he said would have been 20 or 25 miles. He stated that the driver of the Jeep started his turn from the outer lane, which is the east lane for north' bound traffic; and he cut the Jeep in a northwest position to cut across the street; he did not apply hjs brakes and stated that the reason he did not was that there wasn’t enough time for him to apply his brakes and that if he had applied his brakes, and laid the motorcycle over both at the same time that the results would have been worse. He stated that he saw the driver of the Jeep at the scene after the collision and while he was lying on the side of the motorcycle which had caught fire; that the defendant was walking around the Jeep in a daze and that he called to him to come and move him but that the defendant walked around from the front to the rear of the Jeep and that he never did at any time come and remove him from the position he fell when he was thrown from the motorcycle. He suffered a broken right arm and lacerations of the right leg, face and some broken teeth. He stated that he was thrown into the front of the Jeep where the front bumper of the Jeep caught his back. That immediately after the accident *868 Mr. Guerisco carne and pulled him off to the side and went and got his car and carried him to the hospital. He thought the defendant, from his actions at the scene of the collision and also when he saw him at the hospital, had been drinking.
On cross-examination the plaintiff testified that after the accident he did not remain there only a few minutes; that Mr. Guerisco picked him up off the street, put him on the neutral ground - and went and got his car, came back and put him in the car and carried him to the hospital. That he didn’t talk to Mr. Hatch, the defendant, but that he called to him and that Mr. Hatch was walking around from the side to the front and back of the Jeep. It was before Mr. Guerisco came that he called to Mr. Hatch. That he couldn’t testify positively that the defendant. Hatch was drunk but said that it was his opinion that he thought he had been drinking heavily and that he based his opinion on just seeing him walk around mumbling something to himself. That he didn’t see him any more until Hatch came to the hospital to see him and at that time Hatch was under the influence of liquor.
The witness stated that he remained in the outer lane on the east side of the boulevard from the time he entered it at the University and did not pass but one car; that he passed this car and then moved back into the outer lane until he came upon the Jeep and got into the inner lane to pass. That he was about 100 or ISO feet, something like that, behind the Jeep when he first saw it or first noticed it and that there was nothing unusual about the way the Jeep was being operated prior to the impact. That the speed limit in this particular area on the boulevard where the accident occurred was' 45 miles per hour and that he thought the defendant was operating the Jeep at’a speed of 20 or 25 miles per hour and that he was approximately 100 feet in the rear of defendant at the time he decided to pass and at that time he moved from the outer lane to the inner lane and was operating his motorcycle at approximately 25 or 30 miles per hour. He stated that he was not too rapidly gaining on the Jeep and wasn’t going much faster than the Jeep was traveling; and at the time that he entered the inner lane of traffic, he blew his horn and proceeded to pass and then he stated that at the time he got over in the inner lane and started to pass he was a little closer than a block and then said that when he decided to start to pass he was 30 or 40 feet from the Jeep and would not have any idea how far he was from the point of collision when he blew his horn, and quoting the plaintiff’s testimony on cross-examination as to where he was and where he blew his horn:
“Q. How far was it when you blew your horn? A. 30 or 40 feet.
“Q. 30 or 40 feet from the point of collision when you blew your horn?
A. Not from the point of collision— from the Jeep.
“Q. Well, how far were you from the point of collision when you blew your horn? A. I wouldn’t have any idea.
“Q. Did you blow it as soon as you started out to pass the man' a block away or not ? A. After I got into the inner lane and started up ■ going to pass him I blew my horn.
“Q. About how far were you then from the point of impact? A. I wouldn’t know exactly, maybe half a block or three-quarters of a block.
“Q. Two or three hundred feet?
A. Approximately, I guess.
“Q. Did you signal any more until the impact itself or immediately prior to the impact? A. Not until when I seen that Mr. Hatch was turning over. I then laid down on my horn.
“Q.' As I understand it, then you did not have sufficient time to overtake him and pass him in two or three hundred feet from the time you first blew your horn signaling your intention to pass ? A. No, sir.”
The! plaintiff was then particularly questioned as to where the vehicles were-when *869 the impact took place with reference to the break in the neutral ground but he couldn’t give any definite answer, and said it was south of the break in the neutral ground and that he didn’t know exactly for it was maybe 5, 10 or IS feet. He stated that he wasn’t thinking about it at the time and that it- would be just a guess on his part. He stated, his motorcycle was in about the center of the inner lane,of traffic and that the Jeep was in the center of the outer lane; that no part of the Jeep was sticking out over the center line of the two lanes; that when the Jeep commenced to make the left turn he was driving his motorcycle about the center of the inner"' lane. He stated that the Jeep angled off into the inner lane and that he first made a sudden turn and then angled off across his path; that when' he made the turn the front wheels went across the center1 line and at that timé the front end of his motorcycle was approximately just past ’the rear end of the Jeep. He stated that the front end of his motorcycle was just enough forward passing the Jeep to where he couldn’t cut back over to the right trying to miss him and then the impact followed in just a matter of seconds. He stated that the first contact between his motorcycle was on the back end of the Jeep on the left side, on or up to about centerways, which is the door. He admitted that he struck the rear end, the rear side óf the Jeep; that he did not exactly run into the back of the Jeep, he started from the back left side on up to the centerways but that the crash guard, which is on the right side of the motorcycle, could have hit some section of the back of the Jeep. He was then presented with a photograph marked D-2, which shows the left side of the Jeep and also the rear end. He was asked to make an “X” mark where he struck the Jeep. This “X” mark was made above the left rear light and license plate number on the left end of the Jeep. He stated that prior to this left turn being made by defendant he did not give any signal; that the curtains on his Jeep were up and he couldn’t'give any signals. Plaintiff also stated that at the time,of the first impact with the Jeep, the front wheels of his motorcycle were approximately alongside of the Jeep and 'that the right side of his motorcycle, the crash guard and kick stand starter, tore' off the‘tail light of the Jeep and that the 'tail light of the Jeep was on the starter of the motorcycle.
The witness Guerisco stated that he saw the accident at the time it happened; that he had been in the Cobra Lounge and was coming out and was in his car and that his car was facing eást. The driveway to the Cobra Lounge is approximately 20 or 25 feet north of the break in the boulevard where the collision occurred and is on the west side of the street. This witness stated that he was waiting for the traffic’ to come out from towards the university (south) and that he saw the Jeep approximately 150 or 200 feet from the intersection traveling in the right hand lane for north bound traffic; that the Jeep was in the .center of the east lane of traffic, and that the motorcycle was traveling in the inside lane; that the Jeep started a slight turn into the intersection in front of the'motorcycle, and when the motorcycle saw that the Jeep was turning, it tried to make a turn with it. He stated that the motorcycle was approximately at the back end of the Jeep, or five feet to its rear, .when the Jeep turned to go through the break and that when the Jeep turned, it was still in the right hand (east) lane and that.he did not know whether the driver of the Jeep gave any signal or not; that the Jeep was traveling at a speed of approximately 30 miles per hour and that the motorcycle was traveling 20 or 25 miles. He stated that the motorcycle made contact with the left front portion of the Jeep, right back of the left front wheel and then stated that the front bumper of the Jeep struck the motorcycle. He further testified that the collision occurred at the southeast corner of the intersection and that they came to rest approximately 30 feet from there into the intersection, or the break. The-Jeep had not gotten into the break when the collision occurred.- He further stated that the motorcycle blew its horn constantly and that it looked like to him that the driver of the Jeep applied his brakes about the time o'f the impact and that he' heard the brakes applied; that the driver of the motorcycle *870 was. thrown to the front, of the Jeep with the bumper of the Jeep hitting him in the small of. the back; that the motorcycle turned at an angle of 35 or 40 degrees, making a gradual turn and that when the vehicles came to rest the front part of the motorcycle was underneath the Jeep in the middle of the left side. The witness went to the accident and saw the defendant and plaintiff. He asked the plaintiff if he was hurt, picked him up and set him on the side of the curb, ran back to the Cobra Lounge and asked the lady there to call the fire department, drove his car to the .scene of the accident, put the plaintiff in his automobile and carried him to the Baton Rouge General Hospital. He stated that he had only met the plaintiff once before and that was when he was arrested for speeding. After carrying the plaintiff to the hospital, where he arrived at approximately 12:00 o’clock noon, he returned to the scene of the accident where he was questioned by. the pplice officers. He, did not notice any flaps on the Jeep. He stated fhat it was burning on the left hand side and that the driver had to get out on the right hand side; that he didn’t notice any obstruction there to keep a signal being given by the driver of the Jeep from being seen. On cross-examination, the witness testified that the Jeep was in the outer lane of traffic and that the motorcycle was in the inner lane of traffic. He stated that the driver of the motorcycle was blowing his horn and that it was approximately 10 feet in the rear of the Jeep and that was what directed his attention, was the constant blowing of the horn of the motorcycle. This witness stated that he did not realize that an accident was going to happen until he saw the Jeep cutting from the outside lane into the inside lane and at that time the Jeep was about 30 feet from the southern edge of the neutral ground when it began to make a turn to the inside lane; that it made a gradual turn until the point of impact, and that the point of impact was approximately 3 feet south of the edge of the neutral ground. He stated that the motorcycle was trying to cut along the left side, or making a left turn with the Jeep, and applied his brakes at a distance of 25 or 30 feet from the southern edge of the neutral ground and that the two- vehicles continued to travel north a distance of .30 feet- and then collided. The -following testimony was then elicited from the witness by the Court:
“Q. Mr. Guerisco, what I can’t understand about this business, if this man was making a turn gradually what kept the motorcycle man from seeing him? A. Your Honor, the man on the motorcycle was right even with the back of him when the man started making his turn.
“Q. ' You say he was malting his turn gradually. That’s what I don’t understand. ■ What do you mean by gradual? A. Well, he didn’t start off making a full swing all the way around like that. In other words, here is what I’m talking about. If I had a pencil and a piece of paper I could show you..
“Q. If he was turning gradually for thirty feet it looks like the man could have seen him ? , A. Here is the road. The jeep started in right along in here making that tura and the impact happened right here.
“Q. I understand all that but Mr. Hunter asked you. if he made that 'turn suddenly or gradually and you said he was making the turn twenty-five or thirty feet, gradually. If he was making a gradual turn for twenty-five or thirty feet why couldn’t the man behind him see he was going to turn? A. Your Honor, that’s true enough I said twenty-five or thirty feet although I didn’t get out of my automobile and go step it off.”
The witness stated that the operator of the motorcycle, just prior to the Jeep making the turn, was in the center of the inner lane and that the driver of the Jeep was closer to the east curb of the outer lane, or that he was on the extreme edge of the outer lane; and then he stated that from the time he .first saw the motorcycle until the time of the impact the driver of the *871 motorcycle was trying to make a turn along with the Jeep when he saw that the Jeep was making his turn in front of him. And then he was asked :
“Q. Was it about 30 feet from the point of impact when the drivér of the motorcycle started veering to his left?.
A. When the motorcycle started the turn he started to turn about the same time as the Jeep started to turn, I’d say approximately 30 feet from the intersection.” ■ •
The witness further stated that the relative position of the two vehicles when the Jeep first began to make a left turn was that the front wheel of the, motorcycle was about even or abreast of the rear wheel of the Jeep when it started to make the turn; that the front wheel of the motorcycle hit the left front side of the Jeep, back of the left front wheel of the Jeep, and that it did not hit the rear of the Jeep. The witness further stated that he was waiting for traffic coming from the north heading south toward L.S.U. and that he did not notice any traffic headed north;1 that there was only one vehicle headed south and that it had passed before the collision occurred, and was down the highway about a half a block. He álso stated that the motorcycle was traveling slower than the Jeep although the motorcycle was overtaking and passing the Jeep. This witness did not see the defendant go to the Cobra Lounge and get a drink and that the defendant stayed in the Jeep.
The other eyewitness to the accident was John Lawrence Allen. He testified that he was traveling south, going in the opposite direction from thé way the plaintiff and defendant were traveling just prior to the accident; that he was driving 'a taxicab traveling in the outside lane on the west side of the street and was' at a point where a brown automobile is shown in offering D-l. The point is indicated by a circle around the letter “S”. He stated that he saw the Jeep traveling on the inside lane, or lane next to the curb, but he could1 not see the motorcycle. He also stated that he saw traffic in the outer lane heáded toward Baton Rouge and that they were south of' the Jeep and that the Jeep was not far from the intersection when he first saw: it. He stated that' he had gone about a block when the collision occurred and then the following testimony was elicited from him: ■ "
. “Q. How. did you know anything . had happened back behind ? A. - I was facing.the wreck.
' “Q. You hadn’t gotten to it then?
A. No, sir, I‘was' a block off.
“Q. You wete la block this side of ■ it? A. Yes.,
“Q. You didn’t see the wreck then?
A. No; sir, I glanced'at the front of . ■ if and I was watching in the , lane to ' get back over on the right, and when ' I looked back 1 saw the smoke from . the j eep.
“Q. You were going south and that jeep was coming north? A. Yes, sir.
“Q. And the motorcycle was' behind the jeep and you saw-the jeep but you didn’t see the motorcycle? A. No, sir, I 'didn’t see the motorcycle.
“Q. And you heard the wreck, saw the wreck or .what? A. I just heard, some racket.
“Q. Heard the racket? A. Yes.”
This witness later on- testified that the jpbint he identified in the picture by the brown automobile was about 250 feet from the intersection and that there was nothing to have impaired his view. He stated that after he saw the smoke he called in on his radio to the cab stand and asked them to send the fire department and police to the scene-and that when he left they were making pictures. He subsequently went by the police - station and told them that he was a witness to the accident. He stated that the defendant did not act drunk as far as he could ■ tell. ' He put an “X” mark on photograph D-l to indicate the point in the traffic lane where the Jeep was when he first saw it and by a circled “X” mark on the same exhibit he stated that he observed a cut or scratch in the pavement. He did *872 not know that a motorcycle was involved in the accident until he saw Mr. Hebert come from around the Jeep and start across the street. He stated that the motorcycle was not under the side of the Jeep. He stated that some person was trying to move the motorcycle with a pecan limb and pull it out from under the Jeep but that they were not able to move the motorcycle. He did not know whether or not it was defendant. He did not know the defendant at the time but that his brother’s wife had been employed, or was employed, by defendant at his cafe and had been working there seven years and was working there when his brother married her.
The defendant was first called on cross-examination by the plaintiff and admitted that he was driving the Jeep involved in the collision, and at the time- of the collision the Jeep and motorcycle left scratch marks on the pavement. His testimony had previously been taken for the purpose of discovery and he had testified that both of the vehicles left skid marks. He stated that he was traveling on the inside • lane, or left lane of Nicholson Drive, . going north. He denied that he was traveling in th? outer lane. .That he was going to the Cobra Lounge on the west side of the boulevard and that there are two entrances to this lounge from the boulevard, one is parallel with the break through and that the other is slightly north of the break.- He said he had pin ball machines in the Cobra Lounge and he was going there to service his machines. He did not remember seeing the witness Guerisco. He stated that immediately after the wreck he jumped out of the Jeep and ran over to where the plaintiff was and asked him how bad he was hurt and then went to the Cobra Lounge and asked Mrs. Rogers to call an ambulance and she told him that the ambulance had already been called. He denied having .taken a drink of liquor prior to the collision. He admitted that he took a drink, a double shot of liquor, at the Cobra Lounge following the collision. He stated that the motorcycle was trader .the back end of the Jeep when they came to rest; that the motorcycle hit the back of the Jeep and pushed the Jeep upon the north curbing of the - cut-off turning it -south. He stated that the motorcycle immediately caught fire and that he pulled the motorcycle as far out from under the Jeep as he could until it became too hot to handle; and that the front of the motorcycle was under the back rear wheel. He stated that when .the motorcycle hit the end of the Jeep it was knocked clear to the opposite curbing and turned around south and dragged the motorcycle during the maneuver, and that no part of the front of the Jeep ever hit the motorcycle and that the pictures were made after the motorcycle had been moved by him. He stated that he pulled or moved the motorcycle after he went to the Cobra Lounge to see about the ambulance and that when he returned there was a crowd of people congregated.
On direct examination this witness testified that he entered Nicholson Drive where it intersected.with Van Burén; that it is two blocks south of where the accident occurred and that he was going to the Cobra Lounge. He stated that he entered this street in the left lane because he knew that he was going to the Cobra Lounge; that he was driving near the curb of the boulevard and at the time of the impact he was driving 10 or 12 miles an hour; and from where he entered Nicholson Drive to where he began to slow down, he did not drive over 20 or 25 miles an hour and that he slowed down to make a left turn; he stated that part of the front of his Jeep was in the cut-off to the neutral ground and that he never did see the motorcycle being driven by the plaintiff until after the impact; that there was other traffic proceeding north on Nicholson Drive and that it-was heavy at that particular time of day. He stated that it was apparent that he was going to have to stop in the neutral ground; and that he held out his left hand and dropped it down, signaling that he was going to make a left turn at the break; that he never did hear any horn signal given by the motorcycle and that he had no flaps on the doors or back and that his Jeep was in the condition shown by the photograph D-2. He stated that he distinctly remembered that there were two cars traveling north on the boulevard at the time *873 the plaintiff ran into the back end of his Jeep and that these two cars passed about the time of the impact. He stated that the impact took place at the point marked by the plaintiff on D-2 and that the impact knocked the tail light off the Jeep which was imbedded in the motorcycle and that after the impact in the rear the Jeep was knocked to the north end of the break in the neutral ground and turned back south; and that in this maneuver it dragged the motorcycle along with it; that the motorcycle made the cuts or scratches on the pavement. The defendant suffered a laceration on the head. He admitted that he had a double shot of liquor which Mrs. Rogers gave him at the 'Cobra Lounge after the accident. When he went back to the vehicles the second time, he tried to pull the motorcycle from underneath the Jeep, and that he pulled it a foot and a half or two feet trying to keep the Jeep from burning. The witness stated he stayed there 2 or 3 hours after the accident occurred; that he wanted to get hold of the parties who carried his obligation on the Jeep to find out where they wanted the Jeep carried.
The witness denied ever applying his brakes on the Jeep and on the photograph D-3 he states that the impact took place a little closer to the curb than indicated by the red “X”.
The plaintiff tried to impeach the defendant’s testimony by showing a relationship of friendship with the witness J. L. Allen and conversations had with him pri- or to the trial and subsequent to the accident. The sister-in-law of J. L. Allen was in the employ of defendant at his restaurant as cashier. He stated that the fire truck reached the scene of the accident before the police and that the firemen, when they arrived there, sprayed the concrete pavement and also the seats in the Jeep. The defendant testified that the tail light of the Jeep was imbedded in between the slide and its handlebars near the center. The defendant also stated that he looked in his rear view mirror just before giving a hand signal and he did not see anybody behind him and that the mirror was located in the center of the windshield. He also stated that he had a rear view mirror on the outside of the Jeep. He stated that fhe rear view mirror was laying in the bottom of the center of the Jeep. He stated that he removed the rear view mirror from the left hand side of the Jeep while he was waiting for them to come pick up his Jeep after the collision because it was not too securely fastened and he wanted and needed the mirror to put on his truck. He also removed some electrical equipment from the Jeep he had in a tool box because he did not want it to go to the garage. He finally stated that the rear view mirror on the left hand side might have been knocked down on the floor board before the pictures were made.
When questioned by the Court as to whether or not he looked into the rear view mirror before he started to make the left turn he stated he looked in his rear view mirror and that he looked in the center one. If he had looked in the one on the outside it would have shown nothing but the boulevard. The defendant accounts for the rear view mirror being knocked from its position on the inside of the Jeep over the dash because of the forward movement of the seat, causing it to jar. The defendant also stated that when the motorcycle hit him he hit the rear view mirror and knocked it from its normal position.
There is also some evidence introduced by the plaintiff to show that the defendant was fined for operating a slot machine and was convicted of possessing and transporting liquor in Wichita, Kansas, about 20 years prior to the accident. Defendant denied any part of the Jeep striking the plaintiff.
On defendant’s reconventional demand he stated that it cost him about $200 to repair his Jeep and that he paid $50 and that his insurance policy had a provision for a $50 deduction.
Officers William H. Keene and Altazin, Jr., members of the police department of the city of Baton Rouge went to the scene of the accident immediately. They testified as to marks made on the pavement by *874 the vehicles after they collided and also as to measurements of the width of the boulevard and gave evidence of the point of impact from their observation oí the physical facts found in the break or intersection at the time following the collision. These distances are reflected on photograph D-3. They also gave evidence of tire, skid marks and scratches on the pavement showing the course followed by the vehicles after the impact. They also gave testimony showing the position of the Jeep and motorcycle after the impact.
The trial judge on this conflicting testimony which we have attempted to analyze made this observation in his reasons for rejecting the demands of the plaintiffs and also the reconventional demand of the defendant :
“It will be noted that the ‘X’ mark on the photograph D-2 is on the left r'ear end of the jeep and not on the left side thereof. It would seem therefore that the impact began at the place marked ‘X’ on the photograph and continued on the left side of the jeep towards the front. This, if true, substantiates Hatch’s testimony that he was immediately in front of the mot torcycle in the inside lane when the accident occurred. It is true that Guerisco places the jeep in the outer lane and attributes the accident to the left turn from that lane into the inner lane, but the witness Allen, on the other hand places the jeep in the inside lane.
“Depending upon who is right,— Hebert and Guerisco, or Hatch and Allen this accident occurred either because Hatch turned across the path of the motorcycle or the driver of the motorcycle ran into the rear of the jeep while both vehicles were in the inner lane.
“Based upon his belief that his client Hebert correctly stated the facts of the case and that the jeep while traveling in the outer lane of the Boulevard, suddenly made a left turn across the path of the oncoming motorcycle, learned counsel for plaintiff cites several cases pertaining to left turns, namely Michelli v. Rheem Mfg. Co. [La.App.], 34 So.2d 264; Harris v. Bigby [La.App.], 29 So.2d 805 and Lane v. Bourgeois [La.App.], 28 So. 2d 91. Undoubtedly, if the testimony of Hebert and Guerisco is to be accepted and that of Hatch and Allen rejected, these cases should be applied and judgment rendered for plaintiff.
“However, it must be remembered that the burden of proof is upon the plaintiff to prove the allegations of his petition by a preponderance of the evidence.
“If as claimed by Hatch he was in the inner lane of northbound traffic and the motorcycle came up behind him on the same lane, and in an effort to pass on the left struck the Hátch jeep as it was about to proceed into the break or opening to the left, it can not be said that Hatch was responsible for the accident. ,Qn the contrary, it should be said that Hebert was at fault in traveling too close behind the jeep and in attempting to pass while in the inside lane next to the curb.
“As I view this case, I do not believe that the plaintiff has proven the allegations of his petition relating to the accident by a preponderance of the evidence nor do I believe the defendant as plaintiff in reconvention has met this burden.
“It is simply one of those cases where the testimony is so conflicting and confusing that the Court can not say with any degree o.f satisfaction who was at fault.” ■
Our close study and analysis of the evidence has resulted in the same conclusion.
We will also add that if plaintiff is giving a correct version of how the accident occurred he was either contributorily negligent in not passing the Jeep before it reached the break or he was contributorily negligent in not keeping a proper lookout and following it too closely. The photographs introduced in the record and on *875 which the plaintiff relies' clearly show that the skid marks of ’ the vehicles and the course they traveled as reflected by the photograph D-3 were all in the inner lane, or left lane, of traffic going north. The undisputed evidence also shows that the motorcycle first struck the Jeep in the fear end over the tail light. This evidence corroborates the testimony of the defendant and his witnesses that the’ Jeep was in the inner lane of traffic when it was struck from the rear by the motorcycle.. .
It is our opinion that the district judge has corréctly decided the cases under the evidence and that the demands of the plaintiffs should have been rejected as well as the reconventionál demand of defendant because of the failure of each of the parties to prove their case by a preponderance of the testimony.
For the reasons assigned the judgment of the trial court in the suit of Roy Hebert, v. Howard E. Hatch is affirmed.
A separate decree will' be entered in the case of City of Baton Rouge v. Howard E. Hatch affirming the judgment for the same reasons.